**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically at the time and date indicated, which may be materially different from its entry on the record.**



**Russ Kendig
United States Bankruptcy Judge**

**Dated: 03:06 PM April 17, 2014**

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | |
| MICHELE LEE DONLEY, | ) | CASE NO. 13-60758 |
| | ) | |
| Debtor. | ) | ADV. NO. 13-6085 |
| _____ | ) | |
| | ) | JUDGE RUSS KENDIG |
| ALTERCARE OF NAVARRE | ) | |
| CENTER FOR REHABILITATION | ) | |
| & NURSING CARE, INC., | ) | |
| | ) | **MEMORANDOM OF OPINION (NOT** |
| Plaintiff, | ) | **INTENDED FOR PUBLICATION)** |
| v. | ) | |
| | ) | |
| MICHELE LEE DONLEY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

On July 15, 2013, Altercare of Navarre Center for Rehabilitation and Nursing Care, Inc. ("Altercare") filed a complaint to deny the discharge of Michele Lee Donley's ("Debtor") debt with Altercare under 11 U.S.C. § 523(a)(2)(A) or (a)(4). The debt represents Altercare's expenses for the care of Virginia L. Carnes ("Carnes"), who is Debtor's grandmother. Debtor is personally liable for the outstanding balance on Carnes' account. Debtor filed a motion for summary judgment on March 4, 2014 arguing that Altercare cannot prove the elements required to prevent discharge under § 523(a)(2)(A) or (a)(4). Altercare filed a brief in opposition on March 18, 2014.

1

The court has jurisdiction of this case under 28 U.S.C. § 1334 and the general order of reference dated April 4, 2012. In accordance with 28 U.S.C. § 1409, venue in this district and division is proper. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the court.

## Facts

The majority of the facts are not in dispute. Carnes is Debtor's grandmother and is an elderly woman in need of medical assistance. For a significant period of time, Debtor was able to provide the necessary care to Carnes. Because of deterioration in Carnes' health, on March 3, 2005, Carnes executed a durable power of attorney naming Debtor as her attorney-in-fact. By September of 2011 Carnes' health deteriorated to a point where Debtor was no longer able to care for her. It was at that time that Debtor looked at various care facilities, and eventually decided Carnes should be admitted to Altercare. On October 6, 2011, Debtor, Carnes, and Altercare entered into an agreement governing Carnes' care ("the Residency Agreement").

The Residency Agreement is an eleven page contract that addresses Carnes' stay at Altercare, as well as Debtor's liabilities and obligations. On October 6, 2011 Debtor signed the Residency Agreement as Carnes' "Representative." The Residency Agreement addresses: Debtor's ability to access Carnes' assets if fees are owed to Altercare; Debtor's liability if Carnes' assets are transferred while fees are owed to Altercare; the requirement that Debtor cooperate in filing Carnes' Medicaid application; Debtor's monetary liability if Medicaid coverage is denied; as well as many other aspects of the relationship.

Specifically relating to Medicaid eligibility, part (5)(b) of the Residency Agreement is titled "Improper Transfers" and states:

> When applying for Medicaid, the government may examine all transfers of property and resources that the Resident has made (or that were made on his/her behalf) . . . for the past five (5) years, to determine if any improper transfers were made. The government presumes that any transfer of property or resources five (5) years prior to a Medicaid application is improper if the transfer made the Resident Medicaid-eligible, divested the Resident of proceeds that would be available if the property were sold, or if the Resident transfers income producing property or resources. Examples of improper transfers could include: the transfer of the Resident's house, car and other personal property, the transfer of the Resident's bank accounts, stocks or bonds, the transfer of real estate, and the creation of certain trusts. If an improper transfer of the Resident's resources was made, then the Resident will not be eligible to receive Medicaid assistance for a designated period of time from the date the application for assistance is made.

2

The Residency Agreement then asked if Debtor was aware of any improper transfers that may affect Carnes' Medicaid eligibility. Debtor answered "no." However, when Debtor's mother passed away in February of 2007, Carnes made a $50,000.00 gift to Debtor that was used as a down payment on Debtor's home.

Also relating to Medicaid eligibility, Part (5)(d) of the Residency Agreement is titled "Cooperation in the Application Process" and requires Debtor to "make full and complete disclosures regarding all financial resources and income during the Medicaid application process, and to cooperate fully in providing all requested information." On or around October of 2011, Debtor applied for Medicaid benefits on Carnes' behalf, but was denied due to a failure to file all of the required documents. Once Debtor received the missing documents she reapplied for Medicaid benefits. The application was approved, but Carnes was not eligible for benefits until February 28, 2013 due to the $50,000.00 transfer from Carnes to Debtor in 2007. The first and second Medicaid applications ask "has anyone transferred/sold/given away resources in the last 5 years?" Similar to Debtor's answer in the Residency Agreement, Debtor answered "no." Debtor has admitted that she did in fact receive a transfer of $50,000.00 from Carnes in 2007.

On the same day as the execution of the Residency Agreement, Debtor also signed an additional one-page contract title "Personal Guarantee of Payment" ("Personal Guarantee"). Debtor signer her name on the line above "Personal Guarantor." Near the top of the Personal Guarantee the contract states that "[Debtor] voluntarily guarantees payment to [Altercare] for all services and supplies that have been provided, or will be provided in the future, to [Carnes]. That is, [Debtor] agrees to be jointly and severally liable for [Carnes'] financial obligations to [Altercare]." A few sentences later, the Personal Guarantee also states that that Debtor "understands that he or she is not required by law, or by [Altercare], to personally guarantee payment. [Debtor] is agreeing to be liable along with and in addition to [Carnes] for all charges incurred by [Carnes] at [Altercare] on a voluntary basis."

Chris Paul is a representative of Altercare who often explains the Residency Agreement and Personal Guarantee to incoming residents and their representatives. Debtor states that Paul went over the Residency Agreement and Personal Guarantee with her in approximately thirty minutes. While Paul does not have any specific recollection of his discussion with Debtor, he agrees that the process of signing admissions paperwork normally takes thirty minutes. Paul also noted that he tells individuals that the Personal Guarantee requires the guarantor to apply for Medicaid for the resident, but if Medicaid is not available the guarantor will be personally liable for the resident's expenses.

According to Altercare, if Carnes was approved for Medicaid coverage, Debtor and Carnes would owe very little, as Medicaid would make payments directly to Altercare on Carnes' behalf. When Carnes was denied Medicaid coverage she began to fall behind on her Altercare bills. According to Bridget Bazzinotti, an Altercare customer service and collections supervisor, Altercare continued to provide care to Carnes even though she was behind on payments due to assurances from Debtor that Carnes would soon be eligible for Medicaid. If approved without restriction, Altercare would be reimbursed by Medicaid for past services. Debtor contends that because she has no knowledge of the Medicaid application process, and

3

therefore no opinion on whether or not Carnes would be approved for coverage, she did not make any statements to Altercare regarding Carnes' potential Medicaid eligibility.

Altercare also alleges that beginning in September of 2011 Debtor began to make improper transfers out of Carnes' bank accounts in violation of the Residency Agreement, which prohibits transfers out of Carnes' account when a balance is owed to Altercare. Specifically, Altercare notes that all of the checks written on Carnes' account contain Debtor's signature. In addition to a number of checks for questionable purchases, Debtor also made transfers directly from Carnes' bank account into her own bank account. For example, on September 28, 2011, Debtor made a $150.00 transfer from Carnes' account to her own account and on October 4, 2011 wrote a check to Wal-Mart for $79.69 from Carnes' account. Debtor made other allegedly questionable transactions, but those transactions occurred after Debtor and Altercare entered into the Residency Agreement.

When Altercare learned that Carnes was not eligible for Medicaid coverage until February 28, 2013, and that Debtor would not make full payments for services rendered before Carnes' eligibility date, they began formal eviction procedures on April 19, 2012. The reason indicated on the "30-Day Discharge Notice" was that "[t]he resident has failed, after reasonable and appropriate notice to pay, or to have the Medicare or Medicaid program pay on his or her behalf, the care provided by the facility." While Debtor and Carnes made payments totaling $12,155.00 to Altercare, an unpaid balance of $17,441.50 remains. On June 1, 2012 Altercare instituted a state court proceeding in the Stark County Court of Common Pleas seeking judgment on the outstanding debt. On January 23, 2013, the state court granted summary judgment to Altercare in the amount of $17,441.50 against Debtor. On March 28, 2013, Debtor filed for Chapter 7 bankruptcy protection. Altercare seeks to have its $17,441.50 debt deemed nondischargeable under § 523(a)(2)(A) or (a)(4). Debtor's bankruptcy petition lists $46,662.47 in unsecured claims, approximately $17,000.00 of which is the debt with Altercare,[1] $22,818.00 in student loans, $4,963.47 in credit card debt, $1,619.00 for various medical bills, and $262.00 for utilities.

## Arguments

Debtor's current motion for summary judgment addresses Altercare's arguments that discharge should be denied on Debtor's debt with Altercare under § 523(a)(2)(A) or (a)(4). Debtor argues that Altercare has not provided sufficient evidence to survive her motion for summary judgment on any of the elements under § 523(a)(2)(A). Similarly, according to Debtor, because § 523(a)(4) requires a showing of fraud similar to § 523(a)(2)(A), summary judgment should be granted to Debtor on Altercare's § 523(a)(4) claim. Debtor also argues that § 523(a)(4) requires a fiduciary relationship between Debtor and Altercare, and such a relationship does not exist.

In response, Altercare's argument is that issues of fact remain relating to Debtor's state of mind that are inappropriate for summary judgment. Specifically, Debtor made at least one false representation to Altercare in the Residency Agreement. Altercare also points to checks, withdrawals, and transfers from Carnes' account, all of which were signed or authorized by

---

[1] Debtor also lists the debt with Altercare as partially secured in Schedule D.

Debtor, which Altercare believes are questionable uses of Carnes' assets. Altercare believes the false statement and questionable transfers at least raise a genuine issue of material fact as to Debtor's state of mind, foreclosing summary judgment. Altercare also believes a denial of discharge is appropriate under § 523(a)(4) as, counter to Debtor's argument, § 523(a)(4) does not only require a showing of fraud, but instead also allows the lesser showing of defalcation in a fiduciary capacity.

## Law and Analysis

On a motion for summary judgment, facts and reasonable inferences are viewed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). If there are no genuine issues of material fact, and the movant establishes it is entitled to judgment as a matter of law, a court is instructed to grant summary judgment. Fed. R. Bankr. P. 7056. "The moving party has the burden to show that no genuine issue of material fact exists." S. Rehab. Grp., P.L.L.C. v. Sec'y of Health & Human Servs., 732 F.3d 670, 676 (6th Cir. 2013). If the moving party meets its burden, the burden shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586.

### I. Summary Judgment is Inappropriate Under § 523(a)(2)(A)

Section 523(a)(2)(A) provides for the denial of a bankruptcy discharge "for money, property, [or] services . . . to the extent obtained by false pretenses, a false representation, or actual fraud." "The function of this provision is to assist in implementing one of the fundamental pillars of bankruptcy jurisprudence: that bankruptcy relief should only be afforded to the honest, but unfortunate debtor." Chase Bank v. Brumbaugh (In re Brumbaugh), 383 B.R. 907, 912 (Bankr. N.D. Ohio 2007) (quoting Cohen v. de la Cruz, 523 U.S. 213, 217 (1998)). The Sixth Circuit has summarized the elements of a § 523(a)(2)(A) claim as follows:

> (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth;
> (2) the debtor intended to deceive the creditor;
> (3) the creditor justifiably relied on the false representation; and
> (4) its reliance was the proximate cause of loss.

Rembert v. AT & T Universal Card Servs., Inc. (In re Rembert), 141 F.3d 277, 281 (6th Cir. 1998).[2] The burden of proof rests with the plaintiff, who must prove each element by a preponderance of the evidence. Vicars v. Freeman (In re Freeman), 2013 WL 4447007, at *5

---

[2] Some Ohio courts have laid out the § 523(a)(2)(A) test in five elements: "(1) the debtor made a false representation; (2) the debtor knew such representation to be false at the time they were made; (3) the representation was made with intent to deceive the creditor; (4) the creditor justifiably relied on the representation; and (5) the creditor's loss was the proximate result of the misrepresentation being made." In re Finnegan, 428 B.R. 449, 453 (Bankr. N.D. Ohio 2010). The two tests are functionally the same, with the In re Finnegan test essentially breaking the first element into two parts.

5

(Bankr. E.D. Tenn. 2013). Additionally, exceptions to discharge are to be construed liberally in favor of the debtor and strictly against the creditor. In re Rembert, 141 F.3d at 281.

When making inquiries into the debtor's state of mind in elements (1) and (2), and the creditor's state of mind in element (3), a subjective standard should be used. In re Rembert, 141 F.3d at 281; Wilhelm v. Finnegan (In re Finnegan), 428 B.R. 449, 455 (Bankr. N.D. Ohio 2010). This subjective approach "requires that the trier-of-fact focus solely on the individual characteristics of the debtor [or creditor], meaning that traits such as ignorance, incompetency and ineptness may, if established, serve as a valid defense to a § 523(a)(2)(A) action." In re Brumbaugh, 383 B.R. at 912. However, because subjective intent is difficult to prove, courts often look to circumstantial evidence, such as badges of fraud, to infer a party's subjective intent. Mack v. Mills (In re Mills), 345 B.R. 598, 604 (Bankr. N.D. Ohio 2006); In re Brumbaugh, 383 B.R. at 912–13. Courts should not engage in "factor counting," but instead should evaluate all of the evidence to determine if the party had the required intent. In re Rembert, 141 F.3d at 282.

### A. Issues of Fact Remain Regarding Debtor's Knowledge of the Material Misrepresentation in the Residency Agreement

The first element under § 523(a)(2)(A) requires that the debtor obtained the money, property, or services through a false representation, false pretenses, or actual fraud. The "obtained by" language in § 523(a)(2)(A) requires that he fraudulent conduct occurred at the origination of the debt. Silver Care Ctr. v. Parks (In re Parks), 2007 WL 2033380, at * 11 (Bankr. D.N.J. 2007). A false representation made after the money, property or services were obtained is irrelevant, because such a false representation could not have been the reason credit was extended. Id. In support of its § 523(a)(2)(A) claim, Altercare alleges that Debtor made a false representation, defined as an expressed untrue representation, in the Residency Agreement. Adam v. Fletcher (In re Fletcher), 345 B.R. 592, 597 (Bankr. N.D. Ohio 2006).

In the current case, the Residency Agreement asked if Debtor is "aware of any transfer of [Carnes'] property or resources, or of any trusts that have been created, in the past five (5) years." Debtor initialed in the blank next to the answer "No." Debtor admits the statement is untrue, as Carne transferred $50,000.00 to Debtor in February of 2007. Altercare also argues that Debtor made certain questionable withdrawals and transfers from Carnes' accounts in violation of the Residency Agreement. It is unclear whether the transfers between Carnes and Debtor, which started in September of 2011, were material misrepresentation when not disclosed in the Residency Agreement signed on October 11, 2011. However, as Debtor's failure to disclose the $50,000.00 gift from Carnes in the Residency Agreement is a material representation, the court need not dig deeper into Debtor's smaller transfers.

However, the first element of a § 523(a)(2)(A) claim essentially has two parts, (1) a material misrepresentation and (2) that the debtor knew the representation was false at the time it was made. The knowledge requirement encompasses actual subjective knowledge of the material misrepresentation, as well as statements made with gross recklessness as to their truth. Rambush v. Tailford (In re Tailford), 2014 WL 1256038, at *3 (Bankr. N.D. Ohio 2014). Altercare argues that Debtor must have known of the very large $50,000.00 gift that she used to purchase a home, as such an event is not something easily forgotten. Altercare points to Debtor's affidavit signed

6

on December 30, 2013 which admits that Carnes was denied Medicaid coverage due to an improper transfer of $50,000.00. While Debtor's admission indicates that at the end of 2013 she was aware of the improper transfer, it does not indicate that Debtor was aware of the transfer as of October 6, 2011, the date the Residency Agreement was signed. Debtor claims that she did not know her statement regarding impermissible transfers in the Residency Agreement was false at the time it was made. In support of this position, Debtor asserts that a representative from Altercare spent only thirty minutes going over the entire Residency Agreement. Debtor contends that thirty minutes is not enough time for a normal person to understand all of the legal terms in the contract. It is possible that Debtor did not understand portions of the Residency Agreement, or believed that the $50,000.00 gift would not qualify as an improper transfer under Medicaid rules. Because the inquiry is based on the Debtor's subjective state of mind (i.e. whether she actually knew the statement on the Residency Agreement was false or was grossly reckless as to the truth of falsity of the representation), the court finds that there exists a genuine issue of material fact as to Debtor's knowledge of the improper transfer at the time she signed the Residency Agreement.

### B. Issues of Fact Remain Regarding Debtor's Fraudulent Intent to Deceive Altercare

The second element asks if the debtor subjectively intended to deceive the creditor. In re Rembert, 141 F.3d at 281. "Fraudulent intent requires the actual intent to mislead, which is more than mere negligence." Gibbs v. Nevels (In re Nevels), 2007 WL 2042449, at *8 (Bankr. E.D. Tenn. 2007). In other words, "a dumb but honest debtor does not satisfy the test." Id. (internal quotation marks omitted). Therefore, the second element requires scienter, otherwise defined as "a mental state embracing intent to deceive, manipulate, or defraud." AT&T Universal Card Servs. v. Mercer (In re Mercer), 246 F.3d 391, 407 (5th Cir.2001); see also Field v. Mans, 516 U.S. 59, 67–68 (1995). In order to succeed on a claim, the plaintiff must present evidence that the debtor "made false representations that she knew or should have known would convince the [p]laintiff to provide property or services." In re Nevels, 2007 WL 2042449, at *8. When making such a determination, bankruptcy courts should consider whether "the totality of the circumstances presents a picture of deceptive conduct by the debtor which indicates an intent to deceive creditors." Melhorn v. Copeland (In re Copeland), 291 B.R. 740, 766 (Bankr. E.D. Tenn. 2003) (internal quotation marks omitted). While the focus is on whether the debtor had the required fraudulent intent at the time of the false representation, courts may consider a debtor's actions after the false representation to the extent such actions shed light on the debtor's state of mind when the false representation was made. Id.

Courts have often interpreted the second element to look to "whether the debtor subjectively intended to repay the debt" when the debt was incurred. In re Rembert, 141 F.3d at 282. Similarly, if a debtor signs a contract, but at the time of formation had no intention of performing under the contract, a false representation has been made. Stifter v. Orsine (In re Orsine), 254 B.R. 184, 189 (Bankr. N.D. Ohio 2000). However, simply because a debtor fails to pay a debt as it becomes due is not proof of fraud at the debt's inception. In re Freeman, 2013 WL 4447007, at *5. Holding otherwise would result in every debt stemming from a breach of contract being nondischargeable. Schroeder v. Bennett (In re Bennett), 430 B.R. 463, 468 (Bankr. N.D. Ohio 2010) ("It is well established that failure to fulfill a promise, standing alone,

7

is not a sufficient ground upon which to base a finding of fraudulent intent for purposes of § 523(a)(2)(A)."); In re Fletcher, 345 B.R. at 597. When evaluating subjective intent, a debtor who undertakes significant steps to perform under the contract will generally not be found to have acted with the necessary fraudulent intent. In re Mills, 345 B.R. at 605.

A genuine issue of material fact exists as to Debtor's state of mind when she made the false representation in the Residency Agreement. Debtor argues that she had absolutely no knowledge of the Medicaid process, and therefore could not have known the $50,000.00 transfer would make Carnes ineligible for Medicaid. If Debtor was truly unaware of the Medicaid coverage requirements, is seems unlikely that her false representation was made with the subjective intent to fraudulently convince Altercare to provide services to Carnes. Debtor also made payments to Altercare in the amounts of $4,570.00, $2,957.00, $2,314.00, and $2,314.00 on December 12, 2011, January 6, 2012, February 7, 2012, and March 6, 2012, respectively. Debtor's four payments total $12,155.00 and constitute significant steps to perform under the Residency Agreement, which is strong evidence that Debtor did not have the necessary fraudulent intent when entering into the contract. In re Mills, 345 B.R. at 605. However, an Altercare employee stated in an affidavit that Debtor repeatedly told Altercare employees that Carnes was eligible for Medicaid. In addition to the false representation in the Residency Agreement, Debtor also answered "no" on two separate Medicaid applications to the question "has anyone transferred/sold/given away resources in the last 5 years." While Debtor's misrepresentation in the Residency Agreement may be attributed to allegedly being rushed through the document, improperly answering the same question in two separate Medicaid applications, completed months apart, increases the likelihood that Debtor intentionally, or with reckless disregard for the truth, made a false representation to Altercare with the intent to deceive.

### C. There is Evidence That Altercare's Reliance on Debtor's Statements was Justifiable

The third element requires that the creditor justifiably relied upon the debtor's false representation at the time the material misrepresentation was made. In re Rembert, 141 F.3d at 281. Justifiable reliance is a lower standard than reasonable reliance, and should be determined based on the creditor's subjective state of mind. In re Finnegan, 428 B.R. at 455. According to the Supreme Court, a person may justifiably rely on the representation of another even though the truth or falsity of the statement could have been discovered through an investigation. Field, 516 U.S. at 70. For example, a creditor may justifiable rely on the statement that a particular piece of property is free of encumbrances, even though a quick trip to the courthouse would show such a statement to be false. Id. at 70. Justifiable reliance is not without limits though, as "a person is required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." Id. at 70. In Field, the Supreme Court uses the example of a horse with only one eye. Id. at 71. If the one-eyed horse is shown to the purchaser before the sale, the purchaser could not justifiably rely on any statement claiming the horse has two eyes. Id.

8

Debtor argues that Altercare could not have justifiably relied on Debtor's statements pertaining to Carnes' Medicaid coverage because Debtor personally guaranteed any debt. Under the personal guarantee, Debtor argues that Altercare contracted to provide care to Carnes regardless of her Medicaid eligibility because Debtor would cover any missed payments. Therefore, Altercare could not have relied on Debtor's statements pertaining to Carnes' Medicaid eligibility if Altercare was contractually obligated to provide services anyway. Debtor's argument misses the mark, as it addresses proximate cause, not justifiable reliance. Justifiable reliance looks to the subjective reasonableness of a creditor's reliance on a debtor's representation, not whether such representation was the cause of any loss.

The current case is similar to the example from Field, where a party made the false representation that a piece of real property had no encumbrances and the purchasing party failed to conduct a search to substantiate the claim. 516 U.S. at 70. The court determined that an investigation was not required and that the purchaser's reliance on the seller's statement was justified. Id. In the current case, discovering the $50,000.00 transfer between Carnes and Debtor would likely be significantly more difficult than the simple encumbrance search from Field. Therefore, based on Supreme Court precedent, Altercare may be justified in relying on Debtor's representations in the Residency Agreement. Such an outcome may be different if Debtor made allegations that Altercare was aware of Debtor and Carnes' $50,000.00 transfer, or gave other basis for the court to doubt Altercare's subjective reliance on Debtor's statements in the Residency Agreement, but no such evidence has been presented.

### D. Issues of Material Fact Remain Regarding Whether Debtor's False Representation was the Proximate Cause of Altercare's Injury

Element (4) requires that the creditor's reliance on the false misrepresentation be the proximate cause of the loss. One bankruptcy court has explained proximate cause as requiring a plaintiff "to prove that its reliance on the [d]ebtor's representations was the proximate cause of its losses, which depends on whether the [debtor's] conduct has been so significant and important a cause that the [debtor] should be legally responsible." Tweedie v. Hermoyian (In re Hermoyian), 466 B.R. 348, 370 (Bankr. E.D. Mich. 2012) (quoting WebMD Practice Servs., Inc. v. Sedlackek (In re Sedlacek), 327 B.R. 872 (Bankr. E.D. Tenn. 2005). "There must be a direct link between the alleged fraud and the creation of the debt." Id. (internal quotation marks omitted).

In the current case, Debtor argues that because she signed the Personal Guarantee, and because the Personal Guarantee requires Altercare to provide services to Carnes even if a third party (such as Medicaid) refuses payment, the outcome of Carnes' Medicaid application cannot be the proximate cause of Altercare's losses. However, even if Debtor personally guaranteed payment, obtaining Medicaid coverage remains very important to Altercare. Medicaid is a very secure payment stream, essentially eliminating the fear of non-payment present with residents who privately pay for care. Altercare has also provided an affidavit from an employee stating that Altercare relied on Debtor's representations that Carnes would eventually be eligible for Medicaid, and also continued to provide care based on Debtor's representations. However, as noted above, there must be a "direct link between the alleged fraud *and the creation* of the debt." Id. (emphasis added). Therefore, the issue is whether the false representation in the Residency Agreement was the source of Altercare's losses, not if Debtor's later actions caused the losses.

The court does not have sufficient evidence suggesting whether or not Altercare would have entered into the Residency Agreement if the $50,000.00 transfer was properly disclosed. If Debtor had properly disclosed the transfer, and Altercare would have still entered into the contract, Debtor's misrepresentation was not the proximate cause of Altercare's loss. The court does not have sufficient evidence to rule on element (4).

## II. Summary Judgment is Appropriate Under § 523(a)(4)

Debtor argues she is entitled to summary judgment on Altercare's denial of discharge claim brought under § 523(a)(4), which states that discharge should be denied for a debt acquired through "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." While fraud and defalcation require a fiduciary relationship, embezzlement and larceny do not. Robinson v. Robinson (In re Robinson), 2012 WL 4715093, at *3–4 (Bankr. N.D. Ohio 2012).

### A. Debtor is Entitled to Summary Judgment on Altercare's § 523(a)(4) Claim for Defalcation in a Fiduciary Capacity

Defalcation is not defined within the bankruptcy code, but has been used in bankruptcy proceedings since at least 1867. Bullock v. BankChampaign, N.A., 131 S.Ct. 1754, 1758 (2013). The Sixth Circuit has set out the following elements required to show defalcation in a fiduciary capacity: "(1) a pre-existing fiduciary relationship; (2) breach of that fiduciary relationship; and (3) a resulting loss." Commonwealth Land Title Co. v. Blaszak (In re Blaszak), 397 F.3d 386, 390 (6th Cir. 2005). Before there can be a fiduciary duty, a trust must exist, and only express or technical trusts are sufficient. In re Robinson, 2012 WL 4715093, at *5; Mut. Mgmt. Servs. v. Fairgrieves (In re Fairgrieves), 426 B.R. 748, 755 (Bankr. N.D. Ill. 2010). While the existence of an express or technical trust is a matter of state law, federal law determines whether such a trust relationship has been created for the purposes of § 523(a)(4). In re Blaszak, 397 F.3d at 390–91. To create a trust under federal law the following four elements must be satisfied: "(1) an intent to create a trust; (2) a trustee; (3) a trust res; and (4) a definite beneficiary." In re Blaszak, 397 F.3d at 391. Once a fiduciary duty towards a trust has been established, the second element requires a breach of that duty. Id. at 390. A breach requires more than a normal fiduciary breach, but instead requires a breach indicating bad faith, moral turpitude, other immoral conduct, or an intentional wrong. Bullock, 133 S.Ct. at 1759. An intentional wrong includes conduct that the fiduciary knows is improper, as well as criminally reckless conduct, such as being willfully blind to a substantial and unjustifiable risk that the conduct will result in a breach of the fiduciary duty. Id.

The court must first determine if Altercare is able bring a defalcation in a fiduciary capacity claim against Debtor. While both parties agree that a fiduciary relationship exists between Debtor and Carnes, the parties dispute if the same relationship exists between Debtor and Altercare. Under § 523(c), a debt should be denied discharge under § 523 only if there is a "request of the creditor to whom such debt is owed." 11 U.S.C. § 523(c). Focusing on such language, courts have determined that "[o]bjection to discharge under Section 523(a) must always be brought by the particular creditor whose debt is claimed to be non-dischargeable." In re Parks, 2007 WL 2033380, at *12 (quoting Hass v. Hass (In re Hass), 273 B.R. 45, 49 (Bankr. S.D.N.Y. 2002)). Therefore, for a claim to be brought under § 523(a)(4) on a defalcation theory,

the creditor must be the direct victim of the debtor's defalcation in a fiduciary capacity. Consequently, "[a] threshold inquiry is whether a fiduciary obligation runs from the debtor to the creditor." Charles Cnty. Nursing & Rehab. Ctr. v. Marbury (In re Marbury), 2009 WL 4639599, at *2 (Bankr. D. Md. 2009); Buckeye Ret. Co. v. Kakde (In re Kakde), 382 B.R. 411, 431–32 (Bankr. S.D. Ohio 2008) ("[T]he premise of a nondischargeability claim for fraud or defalcation under [§ 523(a)(4)] is that the debtor acted in a fiduciary capacity" towards the creditor). "Put another way, a plaintiff must prove two elements: a fiduciary relationship between it and the debtor and fraud or defalcation committed by the debtor in the course of that fiduciary relationship." In re Marbury, 2009 WL 4639599, at *2; see also Fowler Bros. v. Young (In re Young), 91 F.3d 1367, 1371 (10th Cir. 1996); Lexington Health Care Ctr. Of Elmhurst, Inc. v. McDade (In re McDade), 282 B.R. 650, 658–59 (Bankr. N.D. Ill. 2002); Klenda v. Hogue (In re Hogue), 221 B.R. 786, 793 (Bankr. N.D. Ok. 1998); Kafantaris v. Signore, 2011 WL 1743416 (N.D. Ill. 2011).

In order for Altercare to bring an action under § 523(a)(4), a fiduciary relationship must exists between Debtor and Altercare. A case with facts very similar to the current dispute is In re Parks, where the debtor owed money to Silver Care Center (a nursing home) for services provided to the debtor's mother. 2007 WL 2033380, at *1. The debtor was her mother's power-of-attorney, signed an agreement admitting her mother to the nursing home, and also signed a contract making her liable for all of her mother's unpaid charges. Id. Debtor eventually fell behind on her payments to Silver Care Center and filed bankruptcy, at which time the nursing home brought an adversary proceeding under 523(a)(4) seeing to deny discharge based on the debtor's breach of her fiduciary duty. Id. at 2. The court found in favor of the debtor, reasoning that the various contracts with Silver Care Center "merely created a debtor-creditor relationship, or simply a contractual relationship which did not rise to the level of a fiduciary relationship" between the debtor and Silver Care Center. Id. at *15. Additionally, simply because the power of attorney created a fiduciary relationship between the debtor and her mother it did not "extend or bootstrap that duty to third-party creditors . . . of the person owed the duty." Id. at 15; see also In re McDade, 282 B.R. 650 (holding that a fiduciary relationship between the debtor and his father (who was a resident of a nursing home), was not sufficient to create a fiduciary relationship between the debtor and the nursing home even though the debtor was jointly and severally liable for his father's nursing home debts); In re Marbury, 2009 WL 4639599. Similarly, in the corporate context, if a fiduciary relationship exists between shareholder "A" and a corporation, shareholder "B" of the same corporation cannot bring a claim under § 523(a)(4) against "A" because there is no direct fiduciary relationship between "A" and "B." Marshall v. McCaffrey (In re McCaffrey), 216 B.R. 196 (Bankr. E.D Mich. 1997); see also In re Kakde, 382 B.R. at 431–32; Hoffman v. Stamou (In re Stamou), 2009 WL 1025161 (Bankr. D.N.J. 2009); Blixseth v. Blixseth (In re Blixseth), 459 B.R. 444, 456–57 (Bankr. D. Mont. 2011); White v. Whittle (In re Whittle), 449 B.R. 427, 429–30 (Bankr. M.D. Fla. 2011).

Altercare cites to the case of Woodland Oaks Manor, LLC v. Plybon (In re Plybon), 2012 WL 827349 (Bankr. E.D. Ky. 2012), for support of the position that discharge of Debtor's Altercare debt can be denied under § 523(a)(4). The facts of In re Plybon are very similar to the current case. In In re Plybon, the debtor's husband was admitted into a nursing home, the debtor signed a contract making her personally liable for her husband's nursing home expenses as well as obligating her to comply with obtaining Medicaid coverage for her husband. Id. at *1. The

11

debtor did not timely file her husband's Medicaid application, and when she did file the application it was incomplete. Id. at *3. Due to the debtor's inadequate filings, her husband's Medicaid application was denied and the debtor became liable for $47,692.02 of her husband's expenses. Id. The court determined that the debtor's "failure to obtain the Medicaid benefits and the subsequent failure to meet the financial obligations of [her husband's] care were a breach of her obligations under the [nursing home contract] as the party responsible for [her husband's] financial assets and liabilities." Id. The court then denied the debtor's discharge under § 523(a)(4). Id. Important to note, the court in In re Plybon did not explicitly find the existence of a fiduciary relationship between the debtor and the nursing home. Id. While not completely clear, the court seems to have found the existence of a fiduciary relationship between the debtor and her husband, that failing to file her husband's Medicaid paperwork was a breach of the debtor's fiduciary relationship to her husband and contractual duties to Silver Care Center, and that the husband's denial of Medicaid coverage was due to the debtor's failings and also caused the nursing home's losses. See id.; see also Valley Mem'l Homes v. Hrabik (In re Hrabik), 330 B.R. 765 (Bankr. D. N.D. 2005) (holding that a nursing home could bring a claim under § 523(a)(4) against a resident's power-of-attorney for defalcation in a fiduciary capacity without discussing the existence of a fiduciary relationship between the nursing home and the power-of-attorney).

Faced with two divergent lines of cases, with support for each side within the Sixth Circuit, the court agrees with the reasoning of cases such as In re Parks. Therefore, the court holds that a direct fiduciary link between the debtor and creditor is required to bring a claim of defalcation in a fiduciary capacity. One leading treatise agrees, stating that "for a debt to be nondischargeable under section 523(a)(4), it must be directly related to the fiduciary relationship between the debtor and the creditor." 4 Collier on Bankruptcy, ¶ 523.10[1][d] (Alan N. Resnick & Henry J. Sommers eds., 16th ed. 2013). While Debtor owes a debt to Altercare, such a debt is not based on a defalcation in a fiduciary capacity. Significant in the court's decision that a trust has not been created is the lack of the expressed intent to create a trust between Debtor and Altercare in the Residency Agreement, as evidenced by the lack of the word "trust" or corresponding fiduciary language, which the Sixth Circuit has found to be very important to the creation of a fiduciary relationship. Poynter v. Great Am. Ins. Co. (In re Poynter), 535 F. App'x 479, 482 (6th Cir. 2013). Finally, because exceptions to discharge "are to be strictly construed against the creditor and liberally in favor of the debtor," expanding the scope of the denial of discharge under § 523(a)(4) without clear guidance from the bankruptcy code is inappropriate. In re Tailford, 2014 WL 1256038, at *3 (citing In re Rembert, 141 F.3d at 281). Debtor's motion for summary judgment is granted on Altercare's claim for a denial of discharge under § 523(a)(4) on a defalcation in a fiduciary capacity theory.

> **B. Debtor is Entitled to Summary Judgment on Altercare's Claim Under § 523(a)(4) for Larceny or Embezzlement**

As noted above, discharge can also be denied under § 523(a)(4) for embezzlement or larceny, neither of which requires a showing of a fiduciary relationship. Embezzlement is established by showing that the "(1) [the creditor] entrusted his property to the debtor or debtor lawfully obtained the property, (2) the debtor appropriated the property for a use other than that for which it was intended, and (3) the circumstances indicate fraud." In re Robinson, 2012 WL

4715093, at *4. The third element requires "fraud in fact, involving moral turpitude or intentional wrong, for the purpose of permanently depriving another of property." Id. Larceny is the "the fraudulent and wrongful taking and carrying away of the property of another with intent to convert such property to the taker's use without the consent of the owner." Id. at *3. An argument has not been raised questioning Debtor's power of attorney, putting Carnes' property legally within Debtor's control. Therefore, only embezzlement is available.

Before reaching the individual elements of embezzlement, the court must determine if Altercare has standing to bring a § 523(a)(4) embezzlement claim. As noted above, § 523(c) states that a debt should not be denied discharge under § 523(a) unless there is a "request of the creditor to whom such debt is owed." Therefore, to bring an embezzlement claim within the meaning of § 523(a)(4), the creditor must have been the direct victim of an embezzlement. In re Stamou, 2009 WL 1025161, at *6. Additionally, the property that is the subject of the embezzlement claim must belong directly to the creditor, as an indirect relationship, such as the creditor being owed money by the victim of the embezzlement, is not sufficient. Id. (holding that plaintiff, as a 40% owner of a corporation, could not bring a § 523(a)(4) claim on an embezzlement theory against the debtor because the property that was the subject of the embezzlement belonged to the corporation, not the plaintiff); Bankers Trust Co. v. Hoover, 301 B.R. 38, 53 (Bankr. S.D. Iowa 2003) ("This Court concurs with those decisions that have held or implied there is a requirement that the embezzled property belonged to the adversary complaint plaintiff. To hold otherwise would widen the pool of creditors who could utilize the embezzlement prong of section 523(a)(4) beyond that contemplated by Congress."); Maloney v. Harte (In re Harte), 440 B.R. 133, 143–44 (Bankr W.D. Mich 2010); IBA, Inc. v. Hoyt (In re Hoyt), 326 B.R. 13 (Bankr. W.D.N.Y. 2005).

In the current case, the funds Debtor allegedly improperly transferred starting in September of 2011 belonged to Carnes, not Altercare. While it is true that Altercare is a judgment creditor of Debtor, as well as having language in the Residency Agreement restricting Debtor's ability to transfer Carnes' assets, such an indirect relationship does not give Altercare standing. See In re Fairgrieves, 426 B.R. 748; In re Stamou, 2009 WL 1025161, at *6. Because the property did not belong to Altercare, the alleged embezzlement, and the debt arising out of any embezzlement, also do not belong to Altercare. Only Carnes, as the potential victim of the embezzlement, has standing. Therefore, Debtor's motion for summary judgment on Altercare's § 523(a)(4) larceny and embezzlement claims are granted.

## Conclusion

For the reasons outlined above, Debtor's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**. Debtor's Motion for Summary Judgment is **DENIED** as to Altercare's claims under § 523(a)(2)(A), but is **GRANTED** as to Altercare's claims under § 523(a)(4). An order will be issued simultaneously with this opinion.

It is so ordered.

# # #

**Service List**:

**Tara Reuscher**
Altercare of Ohio Inc / TSG Resources
339 E. Maple Street
Suite 100
PO Box 3050
North Canton, OH 44720

**Nicole L. Rohr**
Thrush & Rohr LLC
4410 22nd Street NW
Canton, OH 44708